## UNITES STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| **SAPIR NATALIE LEVINHAR-BE**, Individually, as surviving Child of Shai Levinhar, (Deceased); <br><br> **LIAT LEVINHAR-BE**, Individually, as surviving widow of Shai Levinhar, (Deceased); <br><br>               PLAINTIFFS, <br><br>     -against- <br><br> **THE ISLAMIC REPUBLIC OF IRAN,** c/o Permanent Mission of Iran to the United Nations, 622 Third Avenue, New York, NY 10017; <br><br> **THE ISLAMIC REVOLUTIONARY GUARD CORPS** c/o Permanent Mission of Iran to the United Nations, 622 Third Avenue, New York, NY 10017; <br><br> **IRANIAN MINISTRY OF INFORMATION AND SECURITY** c/o Permanent Mission of Iran to the United Nations, 622 Third Avenue, New York, NY 10017 <br><br>            DEFENDANTS. | **COMPLAINT** <br><br> CIVIL CASE NO.: _____ <br><br><br> JURY TRIAL DEMANDED |

Plaintiffs in this action are immediate family members of Decedent who was murdered, as a result of the terrorist attacks against the United States on September 11, 2001 (9/11 Attacks).

Plaintiffs are legally entitled to assert these claims pursuant to the Foreign Sovereign Immunities Act (28 U.S.C.§1602et seq.), as amended by §1083 of the Defense Appropriations Act of 2008, H.R. 4986, Pub.L. No.110-181and by§ 3(a) of the

Justice Against Sponsors of Terrorism Act ("JASTA"), S. 2040, Pub. L. No. 114-222, 130 Stat. 852, (enacting 28 U.S.C. §1605B); the Anti-Terrorism Act (18 U.S.C.§2333 et seq.); and the laws of the jurisdictions of Residence of those suffering injuries as hereinafter alleged.

Plaintiffs seek compensatory and punitive damages against Defendants for their role in facilitating and carrying out the attacks.

In support of their claims, Plaintiffs state the following:

## INTRODUCTION

1. On September 11, 2001, 2,976 individuals, referred to herein as "Decedents," were murdered and many other individuals were injured when nineteen terrorists caused four airlines to crash into the World Trade Center Towers in New York, the Pentagon Building in Arlington County, Virginia and a field near the town of Shanksville, Pennsylvania. The nineteen hijackers (hereinafter collectively referred to as the "al-Qaeda hijackers" or the "hijackers") were members of a network known as al-Qaeda, a terrorist organization dedicated to the destruction of the United States and its citizens. The al-Qaeda organization was, and is, dedicated to the goal of establishing a universal Islamic state through the use of violence. Al-Qaeda's ability to conduct terrorist attacks globally is a result of the Defendants' providing material sponsors and supporters. Immediately before the 9/11 Attacks, al-Qaeda maintained its headquarters in Afghanistan.

2. The leader of al-Qaeda was Osama bin Laden (hereinafter referred to as "Bin Laden"), a former citizen of Saudi Arabia who, before his death on May 2, 2011, planned, conspired, funded, directed, controlled, and engaged in terrorist activities and pursuits involving intentional and willful mass murder of thousands of innocent men, women, and children, including the victims of the 9/11 terrorist

attacks. On several occasions, bin Laden admitted al-Qaeda's participation in, and responsibility for, the 9/11 Attacks.

3. Al-Qaeda trained, funded and supported the hijackers, with the aid and assistance of various individuals, organizations, and governments, including Defendants named herein – the Islamic Republic of Iran ("Iran"), its agencies and instrumentalities (referred to collectively as the "Instrumentality Defendants"), and its terrorist proxy, Hezbollah.

4. For years before the 9/11 Attacks, bin Laden had declared and advocated "jihad" – holy war – against the United States. For example, on February 23, 1998, bin Laden urged jihad against Americans and published in the newspaper *Al Quds al-Arabi* the following: *"the ruling to kill the Americans and their allies – civilians and military – is an individual duty for every Muslim who can do it in any country in which it is possible to do it."* On August 20, 1998, President Clinton advised that the United States was taking military action against terrorist objectives in Afghanistan and Sudan: *"Our target was terror; our mission was clear: to strike at the network of radical groups affiliated with and funded by Osama bin Laden, perhaps the preeminent organizer and financier of international terrorism in the world today."* On August 21, 1998, the United States Department of State found that: *"Bin Laden's network leads, funds and inspires a wide range of Islamic extremist groups that perpetrate acts of terrorism around the world."*

5. In conducting their terrorist activities, bin Laden and al-Qaeda received financial, logistical and other material support from foreign states. In particular, Iran and the Instrumentality Defendants provided bin Laden and al-Qaeda with material support that aided the 9/11 terrorist attacks. Plaintiffs now seek to hold Defendants accountable for their role in facilitating these murders.

## JURISDICTION AND VENUE

6. Jurisdiction arises pursuant to 28 U.S.C. §§ 1330(a), (b), 1331 and 1332(a)(2) and 18 U.S.C. §2388. Jurisdiction also arises based on Defendants' violations of 28 U.S.C. §§ 1605(a)(5) and 1605A (the Foreign Sovereign Immunities Act), 28 U.S.C. §1350 ("Alien Tort Claims Act"), the Torture Victim Protection Act of 1991, PL 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. §1350 note (West 1993)), and 18 U.S.C. §2333.

7. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2), 1391(d), 1391(f)(1), and 18 U.S.C. §2334(a).

8. Venue is also proper in this District because the instant lawsuit is related to *Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.,* 03 MDL 1570 (GBD), 03-CV- 09849 (GBD); *Ashton, et al v. al Qaeda et al*, 03 MDL 1570 (GBD), 02 CV 6977 (GBD); *Continental Casualty Co., et al. v. Al Qaeda, et al.*, 03 MDL 1570 (GBD), 04-CV-5970; and *Federal Insurance Co., et al v. al Qaida, et al*, 03 MDL 1570 (GBD), 03 CV 6978 (GBD), which are all part of the Multidistrict Litigation captioned *In Re: Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (FM) and situated in this Court.

9. As herein alleged, actions for wrongful death, personal injury, and related torts perpetrated by foreign states, such as defendant Iran, through their agencies and instrumentalities, and through their officials, employees and agents, fall within the exceptions to jurisdictional immunity contained in the Foreign Sovereign Immunities Act, specifically the non-commercial tort exception contained in 28 U.S.C. §1605(a)(5) and the terrorism exception contained in 28 U.S.C. §1605A.

**PLAINTIFFS**

10. Plaintiff, SAPIR NATALIE LEVINHAR-BE "Sapir," is an individual with an address of 25 Esmond Place, Tenafly, NJ 07670.

11. Sapir is a surviving child of Shai Levinhar, one of the Decedents murdered as a result of the 9/11 Attacks, that were carried out by al-Qaeda and Osama bin Laden, and to which Iran and the Iranian Defendants provided material support and assistance in furtherance of the attacks.

12. Sapir was only six weeks old when her father was murdered.

13. Plaintiff, LIAT LEVINHAR-BE "Liat," is an individual with an address of 25 Esmond Place, Tenafly, NJ 07670.

14. Liat is the surviving widow of Shai Levinhar, one of the Decedents murdered as a result of the 9/11 Attacks, that were carried out by al-Qaeda and Osama bin Laden, and to which Iran and the Iranian Defendants provided material support and assistance in furtherance of the attacks

15. Both Liat and Sapir are citizens of the United States of America.

**DEFENDANTS**

***Islamic Republic of Iran and Iran's State Actors***

16. Defendant Islamic Republic of Iran ("Iran") is a foreign state within the meaning of 28 U.S.C. § 1391(f). Iran maintains an Interest Section within the United States at the Embassy of Pakistan at 2204 Wisconsin Avenue, N.W., Washington, D.C. 20007.

17. Iran has been waging virtually an undeclared war against the United States and Israel for thirty years. Iran wages this undeclared war through asymmetrical, or unconventional, strategies and terrorism, often through proxies such as

Hezbollah, HAMAS, al-Qaeda and others.

18. Iran has for many years been designated as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. §2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. §2371(a) and (b). Iran has been so designated by the U.S. Department of State every year since 1984. Iran has repeatedly been found liable under the Foreign Sovereign Immunities Act, 28 U.S.C. §1602, *et seq.,* for deaths and injuries caused by its activities as a state sponsor of international terrorism, particularly in connection with acts perpetrated by the paramilitary terrorist organization sponsored by Iran known as "Hizballah" or "Hezbollah." Iran's involvement in international terrorism has been documented in a long line of cases in both this Court and the United States District Court of the District of Columbia, including recent decision in *Estate of Heiser v. Islamic Republic of Iran,* 659 F. Supp. 2d 20 (D.D.C. 2009), *Valor v. Islamic Republic of Iran,* 700 F. Supp. 2d 52 (D.D.C. 2010) and *Havlish v. bin Laden,* 2012 WL 3090979 (S.D.N.Y. 2012). *See also* Findings of Fact and Conclusions of Law entered by the Honorable George B. Daniels in *Havlish, et al. v. bin Laden, et al.* on December 22, 2011.

19. Since the time Iran was designated by the State Department as a state sponsor of terrorism, a large body of evidence has been collected and analyzed which shows conclusively that Iran views terrorism as an instrument of state policy, like diplomacy or military power – a tool to be used to further political objectives. The evidence shows that Iran has, over the years, directly carried out assassinations, bombings, and other terrorist acts against its enemies, and Iran has also carried out such terrorist acts through its terrorist proxy, Hezbollah. Iran has also provided direct and indirect support to international terrorist group,

sometimes directly, and other times through Hezbollah, in the form of money, training, sanctuary, documentation, intelligence, weapons and other types of assistance. Al-Qaeda is one such terrorist organization that has received direct and material support from Iran and Hezbollah.

20. To carry out its policy of terrorism and support for terrorist groups, Iran has created and used government organizations including intelligence ministries, the military, and various types of quasi-governmental companies and entities which are directly answerable to, and receive instruction from, the Islamic regime in power in Iran. Some of these entities are named herein as state actors, *i.e.* part and parcel of the Islamic Republic of Iran; others are named herein as the "Instrumentality Defendants."

21. As described herein, Iran acted through its officials, officers, agents, employees, agencies and instrumentalities in providing direct and material support, and resources, to Defendant al-Qaeda. The support provided by Iran included assistance in, and contribution to, the preparation and execution of the plans that culminated in the hijacked flights, the extrajudicial killings of the 9/11 Decedents, and the injuries to the surviving Plaintiffs.

22. Defendant Islamic Revolutionary Guard Corps ("IRGC") is a political/military subdivision of the nation-state the Islamic Republic of Iran. This agency has core functions which are governmental in nature. The IRGC was established by the Iranian constitution, which sets forth the IRGC's responsibilities and powers. The IRGC reports directly to Iran's Supreme Leader, and it operates as an agent and instrumentality of the Supreme Leader himself. The IRGC is a military force parallel to the regular Iranian military and to the formal governmental structure. The IRGC's funding comes in large part from general tax revenues, yet the

IRGC also owns and controls hundreds of companies and commercial interests, and it holds billions of dollars in military, business, and other assets and government contracts. The IRGC has a special foreign division, known as the Qods (or Quds or "Jerusalem") Force, which is the arm of the IRGC that works with militant organizations abroad and promotes terrorism overseas. The Qods Force has a long history of engaging in coups, insurgencies, assassinations, kidnappings, bombings, and arms dealing, and it is one of the most organized, disciplined, and violent terrorist organizations in the world. The U.S. State Department has designated the IRGC as a "foreign terrorist organization," and the U.S. Treasury Department has designated the IRGC-Qods Force as a "terrorist organization." As a government agency, the IRGC maintains a presence in the United States through the Permanent Representative of the Islamic State of Iran to the United Nations, 360 Lexington Avenue, 11th Floor, New York, NY 10017, or through the Iranian Interest Section c/o the Embassy of Pakistan, 2204 Wisconsin Avenue, NW, Washington, DC 20007.

23. Defendant Iranian Ministry of Information and Security ("MOIS") is a political subdivision of the nation-state the Islamic Republic of Iran. This agency has core functions which are governmental, not commercial, in nature. This agency was established by law, its head is appointed by the president subject to confirmation by the parliament, its budget is proposed by the president and approved by the parliament, and its funding comes almost entirely from general tax revenues. Iran's MOIS is a well-funded and skilled intelligence agency with an annual budget between $100 million and $400 million. MOIS has been a key instrument of the government of Iran for its material support of terrorist groups like Hezbollah and as a terrorist agency of the Iranian government. Many of the

U.S. State Department reports on global terrorism over the past twenty-five (25) years refer to MOIS as Iran's key facilitator and director of terrorist attacks. MOIS has been found to be an instrumentality of Iran for purposes of liability and damages under the Foreign Sovereign Immunities Act. *See, e.g., Sutherland. v. Islamic Republic of Iran,* 151 F. Supp. 2d 27, 53 n. 6 (D.D.C. 2001). With a large budget and extensive organization, MOIS is one of the most powerful ministries in the Iranian government. The ministry has traditionally operated under the guidance of the *Velayat-e-Faqih* apparatus of the Supreme Leader.

## FACTUAL BACKGROUND

### *Al Qaeda Participants*

24. Sheikh Usamah bin-Muhammad bin-Laden, Deceased, (hereinafter referred to as "Osama bin Laden" or "bin Laden") is a former citizen of Saudi Arabia who was located in Afghanistan at the time of the terrorist 9/11 Attacks. On May 2, 2011, bin Laden was killed inside a building known locally as Waziristan Haveli in the Bilal Town neighborhood of Abbottabad, Pakistan. At all times material hereto, Osama bin Laden planned, conspired, funded, directed, controlled, and engaged in terrorist activities and pursuits involving intentional and willful mass murder of thousands of innocent men, women, and children. The end result of those activities was the murder of all Decedents on September 11, 2001.

25. Bin Laden announced what he declared to be "jihad" – holy war – against the United States on numerous occasions since at least 1996. On February 23, 1998, bin Laden urged jihad against Americans and published in the newspaper *Al Quds al-Arabi* the following: *"the ruling to kill the Americans and their allies – civilians and military is an individual duty for every Muslim who can do it in any*

*country in which it is possible to do it."* On August 20, 1998, President Clinton stated that the United States was taking military action against terrorist objectives in Afghanistan and Sudan: *"Our target was terror, our mission was clear: to strike at the network of radical groups affiliated with and funded by Osama bin Laden, perhaps the preeminent organizer and financier of international terrorism in the world today."* On August 21, 1998, the United States Department of State found that: *"Bin Laden's network leads, funds and inspires a wide range of Islamic extremist groups that perpetrate acts of terrorism around the world."*

26. In conducting his terrorist activities, Osama bin Laden received financial, logistical and other material support from Defendants Iran, Hezbollah, and the Instrumentality Defendants.

27. Al-Qaeda Islamic Army (hereinafter "al-Qaeda) is an unincorporated association and terrorist organization dedicated to the destruction of the United States and its citizens. At relevant times, the al-Qaeda organization was headquartered in Afghanistan and involved in a cluster of military-ideological camps dedicated to bin Laden and al Qaeda's goal of establishing a universal Islamic state through the use of violence. Al-Qaeda maintains terrorist cells throughout the world.

28. Al-Qaeda uses violence, bombings, murder, mayhem and other terrorist tactics in order to pursue its unlawful objectives. At relevant times, al-Qaeda was supported, funded, protected, aided and abetted by bin Laden and others, including specifically the agencies, instrumentalities, agents, officials and employees of Iran.

29. Al-Qaeda was founded, headed and directed by Osama bin Laden. In addition to bin Laden, certain individuals were responsible for the direction and

management of al-Qaeda's terrorist activities, including the 9/11 Attacks. Those

individuals acted both individually and as agents, instrumentalities, officials,

representatives, officers and employees of al-Qaeda in exporting terror to the

United States and other countries.

### *Background of al-Qaeda*

30. In or about 1989, bin Laden, Muhammad Atef, and others founded an

international terrorist group that became known as al-Qaeda ("the Base").

Osama bin Laden was the "emir" (prince) of al-Qaeda and was its leader at all

relevant times. Members of al-Qaeda pledged an oath of allegiance (called a

"bayat") to Osama bin Laden and al-Qaeda.

31. From 1989 until about 1997, al-Qaeda was headquartered in the Islamic Emirate

of Afghanistan and Peshawar, Pakistan. In or about 1991, the leadership of al-

Qaeda, including its emir, Osama bin Laden, relocated to the Sudan. Al-Qaeda

was headquartered in the Sudan from approximately 1991 until approximately

1996 but also maintained a presence and activities in various parts of the world.

In 1996, bin Laden and other members of al-Qaeda relocated again to the

Islamic Emirate of Afghanistan.

32. Bin Laden and al-Qaeda violently opposed the United States for several

reasons. First, the United States was regarded as an "infidel nation" because it

was not governed in a manner consistent with the group's extremist

interpretation of Islam. Second, the United States was viewed as providing

essential support for other "infidel" governments and institutions. Third, al-

Qaeda opposed the involvement of the United States armed forces in the Gulf

War in 1991 and in Operation Restore Hope in Somalia in 1992 and 1993. In

particular, al-Qaeda opposed the continued presence of American military

forces in Saudi Arabia (and elsewhere on the Arabian Peninsula) following the Gulf War. Fourth, al-Qaeda opposed the United States Government because of the arrest, conviction, and imprisonment of persons belonging to al- Qaeda or its affiliated terrorist groups or those with whom it worked. For these and other reasons, bin Laden declared jihad, or holy war, against the United States, which he carried out through al-Qaeda and its affiliated organizations.

33. At relevant times, al-Qaeda functioned both on its own and through terrorist organizations that operated under its umbrella, including Egyptian Islamic Jihad, which was led by Ayman al-Zawahiri, the Islamic Group (also known as "el Gama'a el Islamiyya"), and a number of jihad groups in other countries, including the Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Philippines, Tajikistan, Azerbaijan, the Kashmiri region of India, and the Chechnyan region of Russia. Al-Qaeda also maintained cells and personnel in a number of countries to facilitate its activities, including Kenya, Tanzania, the United Kingdom, Germany, Canada, Malaysia, and the United States.

34. Al-Qaeda had a command-and-control structure which included a "majlis-ashshura" (or consultation council) which discussed and approved major undertakings, including terrorist operation. Al-Qaeda also had a "military committee" which considered and approved "military" matters.

35. Bin Laden and al-Qaeda forged alliances with representatives of the government of Iran, and its associated terrorist group Hezbollah, for the purpose of working together against their perceived common enemy in the West, the United States.

36. At relevant times, bin Laden and al-Qaeda sponsored, managed, and/or

financially supported training camps in Afghanistan. Those camps were used to instruct members and associates of al-Qaeda and its affiliated terrorist groups in the use of firearms, explosives, chemical weapons, and other weapons of mass destruction. In addition to providing training in the use of various weapons, these camps were used to conduct operational planning against United States targets around the world and experiments in the use of chemical and biological weapons. These camps were also used to train al Qaeda members in security and counterintelligence methods, such as the use of codes and passwords, and to teach members and associates of al-Qaeda about traveling to perform operations. For example, al-Qaeda instructed its members and associates to dress in "Western" attire and to use other methods to avoid detection by security officials. The group also taught its members and associates to monitor media reports of its operations to determine the effectiveness of their terrorist activities.

37. During the time from about 1996 when al-Qaeda operated from its headquarters in the Afghanistan, bin Laden and al-Qaeda forged close relations with the ruling regime, known as the "Taliban" and Taliban leader Muhammad Omar. Bin Laden openly informed other al-Qaeda members and associates outside Afghanistan of their support of, and alliance with, the Taliban and Omar.

38. One of the principal goals of al-Qaeda was to drive the United States armed forces out of Saudi Arabia (and elsewhere on the Arabian Peninsula) and Somalia by violence. These goals eventually evolved into a declaration of jihad (holy war) against America and all Americans. Members of al-Qaeda issued fatwahs (rulings on Islamic law) indicating that such attacks on Americans were both proper and necessary.

39. Like Iran, al-Qaeda and bin Laden used terrorism as an instrument of policy, as

a tool to be used to further political objectives. Al-Qaeda has, over the years, directly carried out murders, bombings, and other terrorist acts against its enemies. It has also provided direct and indirect support to other international terrorist groups and received support in return, often in the form of money, training, sanctuary, documentation, intelligence, weapons, and other types of assistance.

40. Al-Qaeda has often used operatives such as the hijackers to actively engage in terrorist activities against the United States and its citizens. In conducting those terrorist activities, al-Qaeda received financial, logistical, and other material support from Iran and other foreign states.

### *Iran's Sponsorship of Terrorism and al-Qaeda*

41. For many years, the Department of State has included Iran among the state sponsors of terrorism. Indeed, the Department of State has repeatedly described Iran as "the most active" state sponsor of terrorism.

42. At relevant times, Iran provided material support to bin Laden and al-Qaeda, often through Iran's state-sponsored terrorist organization, Hezbollah. That support included advice and assistance in planning attacks against American targets, as well as financial and logistical support for particular operations, including for example the 9/11 Attacks.

43. Imad Fayez Mughniyah (also known as al-Hajj Radwan), for decades before his death in February 2008, was an agent of the Iranian regime and the terrorist operations chief of Hezbollah. Since the early 1980s, Mughniyah was affiliated with the Islamic regime in Iran and lived in Iran for many years. Imad Mughniyah had a direct reporting relationship to Iranian intelligence and a direct role in Iran's sponsorship of terrorist activities.

44. While Osama bin Laden and al-Qaeda were headquartered in Sudan in the early 1990s, noted Islamist leader of the National Islamist Front, Hassan al Turabi, fostered the creation of a foundation and alliance for combined Sunni and Shi'a Muslim opposition to the United States and the West, an effort that was agreed to and joined by Osama bin laden and Ayman al Zawahiri, leaders of al-Qaeda, and by the leadership of Iran.

45. The well-known historical religious division between Sunni and Shi'a Muslims did not pose an insurmountable barrier to cooperation in regard to terrorist operations by radical Islamic leaders and terrorists. Iran, which is largely Shiite, and its terrorist proxy organization, Hezbollah, also Shiite, entered into an alliance with al-Qaeda, which is Sunni, to work together to conduct terrorist operations against the United States during the 1990s and continuing through and after, September 11, 2001.

46. In 1991 or 1992, discussions in Sudan between al-Qaeda and Iranian operatives led to an agreement to cooperate in providing support for actions carried out primarily against Israel and the United States. Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. Osama bin laden also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hezbollah.

47. On October 31, 1991, Iran hosted the International Conference for the Support of the Muslim Palestinian People's Revolution, which was attended by radical Palestinian groups, both Islamic and secular. The conference established a permanent secretariat, funded by Iran, to coordinate pro-intifada activities. In doing so, Iran tightened its ties to the radical groups Palestinian HAMAS and Islamic Jihad.

48. At various times in or about 1992 and 1996, bin Laden and other ranking members of al-Qaeda made it known that they favored a policy under which al-Qaeda would put aside its differences with Shiite Muslim terrorist organizations, including the government of Iran and its affiliated terrorist group Hezbollah, to coordinate attacks against their perceived common enemy, the United States.

49. On or before 1994, al-Qaeda forged an alliance with the National Islamic Front of Sudan and with representatives of the government of Iran, and its associated terrorist group Hezbollah, for the purpose of working together against the United States and other perceived common targets.

50. Hezbollah is financed by the Iranian government. The amounts of Iranian government contributions to Hezbollah have varied over the years, ranging from an estimated 15-20 million dollars annually, to as much as 150-300 million dollars annually. Sheikh Subhi al-Tufeili, Hezbollah's first leader, stated:

> To deny the Iranian connection to Lebanon's Hezbollah would be like denying that the sun provides light to the earth. Who can deny such a thing?

49. Hezbollah's manifesto, as declared by Hezbollah's spokesman, Sheikh Ibrahim al-Amin States:

> We, the sons of Hezbollah's Nation in Lebanon, whose vanguard God has given victory in Iran which has established the nucleus of the world's central Islamic state, abide by the orders of a single wise and just command currently embodied in the supreme examples of Ayatollah Khomeini.
> From this basis, we in Lebanon are not a closed organizational structural party, nor are we a narrow political framework, but we are a nation interconnecting with all Muslims of the World. We are linked by a strong ideological and political connection – Islam.
> From here what befalls the Muslims in Afghanistan, Iraq, the Philippines or anywhere else verily afflicts the body of our own Islamic nation of which we are an inseparable part, and

moved to confront it on the basis of our main legal obligation in light of the political view decided by our leader Wilayat al-Faqih [Ayatollah Khomeini].

50. In 1993, in a meeting in Khartoum, Sudan, arranged by Ali Mohamed, a confessed al-Qaeda terrorist and trainer who is now in a U.S. prison, Osama bin Laden and Ayman al Zawahiri met directly with Iran's master terrorist Imad Mughniyah and Iranian officials, including IRGC Brigadier General Mohammad Baqr Zolqadr, a highly placed member of the Iranian terrorism apparatus. At the 1993 Khartoum conference, representatives of Iran, Hezbollah, and al Qaeda worked out an alliance of joint cooperation and support on terrorism. Ali Mohamed, who was charged with the 1998 bombing of the two United States Embassies in Africa, testified as follows during his guilty plea hearing on October 20, 2000:

> I was aware of certain contacts between al-Qaeda and al Jihad organization, on one side, and Iran and Hezbollah on the other side. I arranged security for a meeting in the Sudan between Mughaniyah, Hezbollah's chief, and bin Laden. Hezbollah provided explosives training for al-Qaeda and al Jihad. Iran supplied Egyptian Jihad with weapons. Iran also used Hezbollah to supply explosives that were disguised to look like rocks.

51. The 1993 meeting in Khartoum led to an ongoing series of communications, training arrangements, and operations among Iran, Hezbollah, and al-Qaeda. Osama bin Laden sent more terrorist operatives to Hezbollah training camps operated by Mughniyah and the IRGC in Lebanon and Iran. Among other tactics, Hezbollah taught bin Laden's al-Qaeda operatives how to bomb large buildings, and Hezbollah also gave the al-Qaeda operatives training in intelligence and security.

52. Throughout the 1990s, the al-Qaeda/Iran/Hezbollah terrorist training arrangement continued. Mughniyah himself coordinated these training activities,

including training of al-Qaeda personnel, with Iranian government officials in Iran and with IRGC officers working undercover at the Iranian embassy in Beirut, Lebanon.

53. As a result of the creation of this terrorist alliance, al-Qaeda's Ayman al Zawahiri repeatedly visited Tehran during the 1990s and met with officers of MOIS, including chief Ali Fallahian, and Qods Force chief Ahmad Vahidi.

54. At all times, Iran's Supreme Leader, Defendant Ayatollah Khamenei, was fully aware that Iran and Hezbollah were training foreign terrorists.

55. On June 7, 1996, Iran's spiritual leader, Ayatollah Ali Khamenei, declared that Hezbollah must reach "all continents and all countries."

56. In early June 1996, Iran organized a pan-Islamist summit which had a primary objective of establishing an international coordination committee to oversee anticipated escalation in hostilities. Ayatollah Ahmad Jannati, a close associate of Ayatollah Khameini, emerged as the spokesperson for the working group. The meeting was organized jointly by the Supreme Council for Intelligence Affairs and the IRCG high command. Attending the working group were the following: Ramadan Shallah (Head of the Palestine Islamic Jihad); Ahmad Salah, a.k.a. Mamdouh Mahmoud Salim (Egyptian Islamic Jihad); Imad Mughniyah (Hezbollah); Muhammad Ali Ahmad (a representative of al-Qaeda and Osama bin Laden); Ahmad Jibril (head of the Popular Front for the Liberation of Palestine-General Command); Imad al-Alami and Mustafa al-Liddawi (HAMAS): and Abdullah Ocalan (Kurdish People Party). The summit participants agreed on the unification of their financial system and training.

57. In or about July 1996, Osama bin Laden met with an Iranian intelligence official in Afghanistan.

58. In early October 1996, bin Laden visited Tehran for consultations. One of the issues addressed was the unification of various Egyptian terrorist organizations. Iranian intelligence Minister Ali Fallahian chaired the meeting with representatives from the Iranian Interior Ministry, Islamic Guidance Ministry, and Foreign Ministry. Among the Egyptians attending were the Tehran-based aid of Ayman al-Zawahiri, Kamal Ujayzah, and Mustafa Hamzah. The Iranians discussed specific long-term operational plans and explained to the Egyptian attendees that the degree of Iran's support depended on the extent of their unity. The Egyptian attendees agreed to form a unified command with Osama bin Laden for operational purposes.

59. In or about mid-September 1997, the Iranian leadership met to discuss the new course of the anti-American struggle. The participants included Iran's supreme and spiritual leader Ayatollah Ali Khamenei. Also present were newly-elected president Mohammad Khatami, former president Ali Akbar Hashemi-Rafsanjani, and the minister of intelligence, Qurban Ali Dari Najafabadi. Other participants in this conference were: General Rahim Safavi (the Commander-in-Chief of the IRGC); General Mohsen Rezai (former Commander-in-Chief of IRGC, later responsible for reorganizing the Iranian security services and their networks); Ali Fallahian (former intelligence minister); Mohammed Mohammadi Rayshahri (former intelligence minister, present as Khamenei's special adviser on intelligence affairs); Hossein Sheikh-ol-Islam (Iran's former deputy foreign minister and once again director on the Office of Liberation Movements); Ali Akbar Mohtashemi; General Diya Sayfi (the commander of the IRGC forces in Lebanon); members of the Supreme National Security Council; and senior IRGC and intelligence officials.

60. In or about September 20-23, 1997, Iranian intelligence organized a major summit of terrorist leaders from all over the world. Among the participants were: Imad Mughniyah and Abdul-Hadi Hammadi (Hezbollah); Ayman al-Zawahiri (Egyptian Islamic Jihad); Ahmad Jibril (chief of the Popular Front for the Liberation of Palestine-General Command PFLP-GC); Osama Abu-Hamden and Imad al-Alami (HAMAS); Ramadan al-Shallah (chief of Palestinian Islamic Jihad); and three commanders representing branches of Hezbollah in the Persian Gulf States.

61. Participants in the summit examined the Islamists' ability to escalate terrorism against the United States and the West. Several senior Iranian officials addressed the summit and ordered the terrorist leaders to be ready to launch an unprecedented international terrorist campaign.

62. In or about late September 1997, the Iranian leadership met again to discuss the course of the forthcoming terrorism offensive in light of the resolutions and findings of the recent international terrorist summit.

63. In the second half of November 1997, Ayatollah Ali Khamenei convened a meeting with General Rahim Safavi and Ahmad Vahidi, the former commander of al-Quds Forces, to discuss the establishment of a new elite terrorist force to carry our spectacular, but deniable, terrorist strikes against the United States and the West.

64. Al-Qaeda telephone bills of international calls between 1996 and 1998 were analyzed by United States investigators, showing that nearly 10% of the outgoing calls from Afghanistan went to Iran.

65. The creation of the Iran/Hezbollah/al-Qaeda terrorist alliance, which began in the early 1990s, and during which Hezbollah terror chief Imad Mughniyah

oversaw the training activities of member of various terrorist groups until his death in 2008, resulted in a string of deadly terrorist strikes aimed directly at the U.S. and its allies. Among these terrorist attacks were the following: in March 1992, a Hezbollah terrorist team operating under Mughniyah's command truck-bombed the Israeli embassy in Buenos Aires, Argentina; on February 26, 1993, the first World Trade Center bombing by al-Qaeda operatives occurred; a few months later, an al-Qaeda conspiracy to bomb several New York landmarks, including the Lincoln Tunnel and the Holland Tunnel, was disrupted; in July 1994, Mughniyah and a Hezbollah team, under the direction of Iran, MOIS, and the IRGC, truck bombed the *Asociación Mutual Israelita Argentina* ("AMIA"), the Jewish cultural center in Buenos Aires; in December 1994, Algerian terrorists associated with al Qaeda hijacked a French airliner, intending to crash into the Eiffel Tower in Paris, a precursor to 9/11; on July 7, 1995, Ayman al Zawahiri's Egyptian gunmen, supported, trained, and funded by Iran, attempted to assassinate Egyptian President Hosni Mubarak near Addis Ababa, Ethiopia; on June 25, 1996, Saudi Hezbollah terrorists, acting on directions from Iran and under planning by the IRGC Qods Force commander, and with assistance from al-Qaeda, truck bombed the Khobar Towers housing complex in Dhahran, Saudi Arabia, where U.S. military serviceman were quartered; on August 7, 1998, two nearly simultaneous truck bombings, carried out by al-Qaeda under the direction of Iran, MOIS, and the IRGC, and with training by Hezbollah, destroyed the U.S. embassies in Nairobi, Kenya, and Dar-es-Salaam, Tanzania; on October 12, 2000, al-Qaeda suicide bombers attacked the U.S.S. Cole in the harbor of Aden, Yemen.

66. According to the State Department's *Patterns of Global Terrorism 2000,* Iran

remained the most active state sponsor of terrorism in 2000. In provided

increasing support to numerous terrorist groups, including the Lebanese

Hezbollah, Hamas, and the Palestine Islamic Jihad (PIJ), which seek to

undermine the Middle East peace negotiations through the use of terrorism.

67. The State Department's *Patterns of Global Terrorism 2000* also stated that

Iran's "Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and

Security (MOIS) continued to be involved in the planning and executing of

terrorist acts and continued to support a variety of groups that use terrorism to

pursue their goals."

68. In January 2001, Dr. Ayman al-Zawahri and other al-Qaeda leaders met with

Iranian intelligence officials near the town of Varamin, just south of Tehran.

69. The Iranian delegation was headed by Hojjat-ol eslam Ali Akbar Nateq-Nouri

and included Imad Fayez Mugniyeh, the Lebanese operative and leader of

Hezbollah who is credited with numerous terrorist attacks on Americans. The

purpose of the meeting was to plan and coordinate Iranian support for an

upcoming al-Qaeda operation against the United States.

70. On May 4, 2001, a second planning meeting between al-Qaeda and Iranian

intelligence officials was held in Iran. Attendees at this planning meeting

included Khamenei, Rafsanjani, and bin Laden's son, Sa'ad bin Laden. Iranian

intelligence memos written in the weeks following the meeting advised Iranian

operatives to be prepared for U.S. retaliation for an attack planned for

September 2001.

### *The 9/11 Attacks*

71. During the mid-to-late 1980s, Iran began formulating contingency plans for

asymmetrical or unconventional warfare against the United States, including

terrorist operations. These contingency plans were code-named "*Shaitan dar Atash.*"

72. One of the *"Shaitan dar Atash"* contingency plans was for the hijacking of U.S. commercial airliners and crashing them into buildings, particularly in New York City and Washington, D.C. This contingency plan became the blueprint for the 9/11 Attacks.

73. Defendants Iran and Hezbollah had actual foreknowledge of, and were complicit in the planning and coordination of the 9/11 Attacks upon the United States which were carried out by members of defendant al-Qaeda under the direction of the defendant Osama bin Laden.

74. In the mid-1990s, when the Iran/Hezbollah/al-Qaeda terror alliance was forming, al-Qaeda operative Mustafa Hamid had "negotiated a secret relationship with Iran that allowed safe transit via Iran to Afghanistan." This safe Iran-Afghanistan passageway was managed by defendant MOIS.

75. In 2000, Iran facilitated the international travel of al-Qaeda's operative's between October 2000 and February 2001, including travel of at least eight of the 9/11 hijackers from Iran into Afghanistan, where bin Laden's training camps were located, and where the 9/11 hijackers trained for the 9/11 operation. Iran thus provided essential material and direct support of the 9/11 Attacks.

76. The Iranian government materially and directly supported the 9/11 terrorist travel operation by ordering its border inspector not to place telltale Iranian stamps in the passports of these future hijackers traveling to and from Afghanistan via Iran. Eight to fourteen of the 9/11 hijackers transited Iran on their way to or from Afghanistan, and Iranian border inspectors did not stamp their Saudi passports. The Iranians were aware they were helping operatives who were part of an

organization preparing attacks against the United States. The action of Iranian border authorities in refraining from stamping the passports of the Saudi hijackers vastly increased the likelihood of the operation success of the 9/11 plot.

77. A terrorist agent of Iran and Hezbollah also helped to coordinate other international travel by the 9/11 hijackers. In October 2000, Mughiyah, the Hezbollah terrorist commander, visited Saudi Arabia to coordinate future 9/11 hijacker activities there and assisted them in traveling on to Iran during November 2000. During this time period, on their travels in and out of Iran, and through Beirut, Lebanon, some of the 9/11 hijackers were accompanied by Mughniyah or his Hezbollah associate.

78. The action of Mughniyah, and his Hezbollah associate(s), in escorting 9/11 hijackers on flights to and from Iran, and coordinating passport and visa acquisition activities in Saudi Arabia constituted direct and material support for the 9/11 conspiracy.

79. Before September 11, 2001, al-Qaeda, with the aid, assistance, and support of Defendants, planned, funded, and coordinated an attack upon American citizens. On September 11, 2001, nineteen al-Qaeda operatives perpetrated that heinous attack by hijacking four airlines laden with jet fuel and causing them to crash into the World Trade Center Towers in New York, the Pentagon Building in Virginia, and a field in Shanksville, Pennsylvania. Each of the hijackers is known to have been an operative in the al-Qaeda terrorist network.

80. On September 11, 2001, five of the al-Qaeda hijackers – Mohammed Atta, Abdul Alomari, Wail al-Shehri, Waleed al-Shehri, and Satam al-Suqami, hijacked American Airlines Flight 11 carrying 92 persons, bound from Boston to

Los Angeles, and crashed it into the North Tower of the World Trade Center in New York at approximately 8:46a.m., causing the collapse of the tower, the deaths of the 9/11 Decedents, and injuries to the Plaintiffs.

81. On September 11, 2001, five al-Qaeda hijackers – Marwan al-Shehhi, Fayez Ahmed, a.k.a. "Banihammad Fayez," Ahmed al-Ghamdi, Hamza al-Ghamdi, and Mohand al-Shehri – hijacked United Airlines Flight 175 carrying 65 persons, bound from Boston to Los Angeles, and crashed it into the South Tower of the World Trade Center in New York at approximately 9:02a.m., causing the collapse of the tower and the deaths of the 9/11 Decedents, and injuries to the Plaintiffs.

82. On September 11, 2001, five al-Qaeda hijackers - Khalid al-Midhar, Nawaf al-Hazmi, Hani Hanjour, Salem al-Hamzi, and Majed Moqed - hijacked American Airlines Flight 77 carrying 64 persons, bound from Virginia to Los Angeles, and crashed it into the Pentagon Building in Arlington County, Virginia at approximately 9:37 a.m., causing the deaths of the 9/11 Decedents, and injuries to the Plaintiffs.

83. On September 11, 2001, four al-Qaeda hijackers – Ziad Jarrah, Ahmed al-Haznawi, Saeed al-Ghamdi, and Ahmed al-Nami – hijacked United Airlines Flight 93 carrying 45 persons, bound from Newark to San Francisco, and caused it to crash in a field near the town of Shanksville, Pennsylvania at approximately 10:10 a.m., causing the deaths of the 9/11 Decedents and injuries to the Plaintiffs.

84. The 9/11 terrorist hijackings and attacks referenced above resulted in the murder of the 2,976 Decedents and injuries to the Plaintiffs. The hijackers used box cutters and knives to commit air piracy and murder on behalf of al-Qaeda.

They were assisted in their terrorist campaign by the Iran and the Instrumentality Defendants.

### Iran's Support of al-Qaeda After the 9/11 Attacks

85. Iran and its instrumentalities continued to support al-Qaeda after the 9/11 Attacks. Iran provided material support to al-Qaeda after the 9/11 Attacks by providing safe haven to al-Qaeda leaders and operatives, keeping them safe from retaliation by U.S. forces, which invaded Afghanistan.

86. Former Secretary of Defense Donald Rumsfeld stated on February 3, 2002, "We have any number of reports that Iran has been permissive and allowed transit through their country of al-Qaeda." On February 4, 2002, Rumsfeld elaborated: "We do have a good deal of information to the effect that al-Qaeda and the Taliban have taken refuge there and others have used it as a transit point. We have no evidence at all that Iran has tried to stop them, that Iran has tried to turn them over to us or some other country or to incarcerate these people, the al-Qaeda, a terrorist network."

87. In the late 1990s al-Qaeda operative Mustafa Hamid had passed communications between Osama bin Laden and the Government of Iran. In late 2001, while in Tehran, Hamid negotiated with the Iranians to relocate al-Qaeda operatives and their families to Iran after the 9/11 Attacks.

88. Pursuant to these negotiations, Iran facilitated the exit from Afghanistan, and into Iran, of numerous al-Qaeda leaders, operatives and their families when the United States-led multi-national coalition attacked the Taliban regime in Afghanistan in the fall of 2000. The Iran-Afghanistan safe passageway, established earlier to get al-Qaeda recruits into and out of the training camps in Afghanistan, was utilized to evacuate hundreds of al-Qaeda fighters and their

families from Afghanistan into Iran for safe haven there. The IRGC knew of, and facilitated, the border crossings of these al-Qaeda fighters and their families entering Iran.

89. Among the high-level al-Qaeda officials who arrived in Iran from Afghanistan at this time were Sa'ad bin Laden, a son of Osama bin Laden, and the man who would soon lead "al-Qaeda in Iraq," Abu Mussab Zarqawi. As the leader of al-Qaeda in Iraq, Zarqawi was responsible for a series of bombings, beheadings, and other attacks before being killed by U.S. forces in June 2006.

90. The No. 2 official of al-Qaeda, Ayman al Zawahiri, made particular arrangements for his own family's safe haven in Iran after 9/11, with the aid of his son-in-law Muhammad Rab'a al Sayid al Bahtiyti, an Egyptian-born al-Qaeda operative.

91. In late 2001, Sa'ad bin Laden facilitated the travel of bin Laden family members from Afghanistan to Iran. Thereafter, Sa'ad bin Laden made key decisions for al-Qaeda and was part of a small group of al-Qaeda members involved in managing al-Qaeda from Iran.

92. During the months and years after the 9/11 Attacks, Defendants Iran, the IRGC, and MOIS continued to provide substantial direct and material support to the al-Qaeda leaders, operatives, and their families inside Iran, that provided for their needs and shelter and maintained their safely from American and U.S.-led coalition military forces in Afghanistan.

93. Since 2001, there have been numerous instances of al-Qaeda operatives and leaders meeting, planning, and directing international terrorist operations from the safety of Iranian territory. Senior al-Qaeda members continued to conduct terrorist operations from inside Iran. The U.S. intercepted communications from

Saef al Adel, then in Mashad, Iran, to al-Qaeda assassination teams in Saudi Arabia just before their May 12, 2003 assault on three housing compounds in Riyadh. Al-Qaeda leaders in Iran planned and ordered the Riyadh attack.

94. On July 28, 2001, the United States Treasury Department designated a node of the al-Qaeda terror network based inside Iran, freezing all of its financial assets under United States jurisdiction and prohibiting any transactions with its identified operatives. The Treasury Department stated that some members of the network are based outside of Iran, but funnel recruits and cash through Iran "under an agreement between al-Qaeda and the Iranian government."

95. One member of this network is Atiyah Abd al-Rahman ("Rahman"). The documents captured in the safe house occupied by Osama bin Laden at the time of his capture identify Rahman as bin Laden's top deputy. According to the Treasury Department, Rahman is al-Qaeda's "overall commander in Pakistan's tribal areas and as of late 2010, the leader of al-Qaeda in North and South Waziristan, Pakistan." The Treasury Department adds: "Rahman was previously appointed by Osama bin Laden to serve as al-Qaeda's emissary in Iran, a position which allowed him to travel in and out of Iran with the permission of Iranian officials." For several years after 9/11, Rahman was protected by the Iranian regime. He is one of the senior al-Qaeda leaders supposedly held under a loose form of "house arrest" in Iran.

96. The Iran-based Al Qaeda network is headed by another terrorist, Ezedin Abdel Aziz Khalil (a/k/a Yasin al Suri). The Treasury Department's designation notes that "Iranian authorities maintain a relationship with Khalil and have permitted him to operate within Iran's borders." Khalil's activities include moving "money and recruits from across the Middle East into Iran, then on to Pakistan," where

they serve senior al-Qaeda leaders.

97. According to David S. Cohen, Under Secretary of Treasury for Terrorism and
Financial Intelligence, "There is an agreement between the Iranian government
and al-Qaeda to allow this network to operate. There's no dispute in the
intelligence community on this."

### *Defendants Are Liable to Plaintiffs for Their Material Support of al-Qaeda*

98. Defendants instructed, trained, directed, financed, and otherwise supported and
assisted al-Qaeda, or conspired in the instruction, training, direction, financing,
and support of al-Qaeda, in connection with al-Qaeda's terrorist plans. In
furtherance of those plans, the al-Qaeda hijackers deliberately caused planes to
crash into the World Trade Center Towers, the Pentagon, and a field in
Shanksville, Pennsylvania on September 11, 2001.

99. As a direct and proximate result of the intentional, willful, reckless, and careless
actions of Defendants, the Plaintiffs have suffered severe and permanent
personal injuries, damages, and losses, including the following:

    a) Decedent's fear of death prior to the crash into and collapse of the World
Trade Center Towers, the crash into the Pentagon, and the crash of
United Airlines Flight 93;

    b) the severe mental anguish suffered by the Decedent and the Plaintiffs;

    c) the severe pain and suffering suffered by the Decedent and Plaintiffs;

    d) the inability of Decedent and the injured Plaintiffs to perform the usual
household and personal activities that they normally would have
performed through the remainder of their natural life expectancies;

    e) loss of Decedent's and the injured Plaintiffs' earnings and future earning
potential;

f) loss of Decedent's life and life's pleasures;

g) loss of consortium, solatium, and/or companionship;

h) costs relating to managing the estates of all Decedent, and

i) death of the Decedent by way of murder as a result of the Defendants' conduct and that of their co-conspirators.

100. The aforementioned death, personal injuries and losses experienced by the Plaintiffs were caused by the intentional, outrageous, reckless, and careless acts of all Defendants, acting individually and in concert, and of their agents, servants, employees, agencies and instrumentalities, acting within and during the course and scope of their employment, authority, or apparent authority.

## CLAIMS

### COUNT ONE

*CLAIMS ON BEHALF OF U.S. NATIONAL PLAINTIFF AND*
*VICTIM AGAINST ALL DEFENDANTS UNDER § 1605A*
*OF THE FOREIGN SOVEREIGN IMMUNITIES ACT*
*28 U.S.C. § 1605A*

101. The Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

102. At all relevant times, defendant Iran was and remains a foreign state designated as a state sponsor of terrorism as required by 28 U.S.C. § 1605A(a)(2)(A)(i)(I) to maintain an action under § 1605A of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

103. The conduct of the Al Qaeda hijackers constituted acts of extrajudicial killing, torture, aircraft sabotage, and hostage taking within the meaning of FSIA § 1605A(a)(1).

104. Iran and the Instrumentality Defendants provided material support and

resources to al-Qaeda in furtherance of those acts of the al-Qaeda hijackers.

105. At all relevant times, Al Qaeda and the hijackers were agents of Iran acting within the scope of their agency.

106. The conduct of all Defendants violated the provisions of the FSIA, in particular 28 U.S.C. § 1605A, and the Plaintiffs suffered damages as a result of that violation.

107. Plaintiffs, as family members of certain 9/11 Decedent who suffered personal injuries from the 9/11 Attacks, is entitled to recover damages from all Defendants under the provisions of the FSIA.

108. The injuries and damages suffered by the Plaintiffs personally and/or by virtue of the death the 9/11 Decedent, and the consequences resulting there from, were proximately caused by the intentional and reckless acts of all Defendants as described herein.

109. As a direct and proximate result of the death of the 9/11 Decedent, the Plaintiffs have been deprived of future aid, assistance, services, comfort, and financial support.

110. As a direct and proximate result of the Defendants' cowardly, barbaric and outrageous acts of murder, the Plaintiffs will forever grieve the death of the 9/11 Decedent.

111. As a further result of intentional and reckless acts of the Defendants, the Plaintiffs have incurred expenses for which they are entitled to recover.

112. As a result of the Defendants' murderous conduct, the 9/11 Decedent and the injured Plaintiffs suffered damages including pain and suffering, trauma, emotional distress, loss of life and life's pleasures, loss of earnings and earning capacity, loss of accretion to their estates and other items of damages as fully

set forth in the paragraphs above which are incorporated herein by reference.

113. As a result of the intentional, reckless and negligent acts of the Defendants as described above, the 9/11 Decedent and the injured Plaintiffs were placed in apprehension of harmful and offensive bodily contact (assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety, emotional and psychological distress (intentional/negligent infliction of emotional distress), and were mentally and physically harmed, trapped, and falsely imprisoned (false imprisonment) prior to the Decedent's death and/or injuries.

114. The actions of all Defendants, acting in concert to carry out their unlawful objectives, were malicious, outrageous and in willful, wanton, and reckless disregard of the rights of the 9/11 Decedent and the Plaintiffs. The Defendants, acting individually and jointly, intended to carry out actions that would end the life of the Decedent and cause injury to the Plaintiffs.

115. The Plaintiffs are entitled to solatium and other damages, as stated in § 1605A(c)(4) of the FSIA, 28 U.S.C. § 1605A(c)(4).

116. As a result of their intentional, malicious, outrageous, willful and wanton conduct, all Defendants are jointly and severally liable to the Plaintiffs for punitive damages.

**WHEREFORE**, the Plaintiffs demand judgment in her favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000.00) for compensatory damages, punitive damages, and solatium, plus interest, costs, fees and such other monetary and equitable relief as this Honorable Court deems appropriate.

## COUNT TWO

### *CLAIM BY PLAINTIFFS AGAINST ALL DEFENDANTS PURSUANT TO § 1605(a)(5) OF THE FOREIGN SOVEREIGN IMMUNITIES ACT 28 U.S.C. § 1605(a)(5)*

125. Plaintiffs incorporate herein by reference the averments contained in the preceding paragraphs as though fully set forth at length.

126. At all relevant times, Defendant Iran was and remains a foreign state and the within action is a case wherein money damages are sought against a foreign state, Iran, for personal injuries and death occurring in the United States and caused by the aforementioned tortious acts and omissions of that foreign state and its officials and/or employees while acting within the scope of their office or employment.

**WHEREFORE**, the Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000.00) for compensatory damages, punitive damages, and solatium, plus interest, costs, fees and such other monetary and equitable relief as this Honorable Court deems appropriate.

## COUNT THREE

### *WRONGFUL DEATH*

127. The Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

128. The Plaintiffs herein bring this consolidated action pursuant to F.R.C.P. 42 for the wrongful death proximately caused by the Defendants engaging in, materially supporting or sponsoring, financing, aiding and abetting, scheming and/or otherwise conspiring to commit or cause to occur acts of murder and

wrongful death, specifically, the mass murder committed by the 9/11 Attacks.

129. Surviving family member of those wrongfully killed is entitled to recover damages from Defendants for the illegal and wrongful death. The family member is entitled to recover full damages incurred, as fair and just compensation for the injuries resulting from the wrongful death. Those responsible for the death must be held accountable for the losses incurred.

130. The injuries and damages suffered by the Plaintiffs were proximately caused by the intentional, malicious, reckless, criminal, violent, grossly negligent or negligent acts of the Defendants as described herein.

131. As a direct and proximate result of the wrongful death of the Decedent, his heir and family have suffered financially and been deprived of all future aid, income, assistance, services, comfort, companionship, affection and financial support of their loved one.

132. As a direct and proximate result of the Defendants' acts of international terrorism torture, conspiracy and racketeering resulting in the wrongful death of Decedent, the heirs and family of the murdered suffers and will continue to suffer permanent, physical and emotional distress, severe trauma, and lasting physical, emotional, and psychological injuries.

133. As a further result of intentional, willful, wanton, malicious, reckless, criminal, negligent, wrongful, illegal and tortious acts and conduct of the Defendants, the Plaintiffs have incurred actual damages including but not limited to ongoing medical expenses related to psychological trauma, physical injuries, and other expenses and losses for which she is entitled to full and fair recovery.

**WHEREFORE**, the Plaintiffs demand judgment in her favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of One

Billion Dollars ($1,000,000,000.00) for compensatory damages, punitive

damages, and solatium, plus interest, costs, fees and such other monetary and

equitable relief as this Honorable Court deems appropriate.

## COUNT FOUR

### *SURVIVAL*

134. The Plaintiffs incorporate herein by reference the allegations contained in all

preceding paragraphs.

135. As a result of the intentional, malicious, reckless, conspiratorial, criminal,

grossly negligent and negligent acts of Defendants as described herein,

Decedent was killed on September 11, 2001, was placed in a severe, often

prolonged, extreme, traumatic, apprehension of harmful, offensive unwarranted

bodily contact, injury and assault. This murdered suffered intensely severe and

offensive harmful bodily contact, personal injury and battery; including but not

limited to extreme fear, terror, anxiety, emotional and psychological distress,

knowledge of pending death and physical and emotional trauma, intentionally

inflicted physical pain.

136. Decedent was mentally, physically, and emotionally damaged, harmed,

trapped, and falsely imprisoned prior to his personal physical injury and death.

137. As a result of Defendants' criminal and tortious conduct, Decedent suffered

damages including pain and suffering, severe trauma, fear, anxiety, permanent

physical and emotional distress, ultimate loss of life and life's pleasures,

companionship and consortium, loss of family, career, earnings and earning

capacity, loss of accretion to the estate, and other immeasurable items of

damages to be shown at trial. The Plaintiffs herein seek and is entitled to

survival damages for Decedent tortured and killed on September 11, 2001.

**WHEREFORE**, the Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, for an amount authorized by governing law to be determined at trial, together with pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

<b>JURY TRIAL DEMAND</b>

Pursuant to Federal Rule of Civil Procedure 38(b), the Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: September 11, 2022

**Law Offices of Elliott Malone, Esq. LLC**

By: /s/Elliott Malone
Elliott Malone, Esq.
Attorney ID #: 4812640
Law Offices of Elliott Malone, Esq. LLC
50 County Rd.
Cresskill, NJ 07626
201-906-8387 (cell)
866-382-6287 (fax)
em@emalonelaw.com